**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**KEVIN WAYNE DALTON,**

      **Plaintiff,**

**v.**                                     **Case No.: 1:17-cv-03756**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable David A. Faber, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 7, 13).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

1

pleadings be **GRANTED;** the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On September 3, 2013, Plaintiff Kevin Wayne Dalton ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of June 13, 2013 due to "diabetes, diabetic foot ulcers, back injury, shoulder injury, arthritis, neuropathy, high blood pressure, obesity, history of cellulitis, [and] degenerative disc." (Tr. at 913-26, 951). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 61). Claimant then filed a request for an administrative hearing, which was held on February 12, 2016 before the Honorable Michael Comisky, Administrative Law Judge. (*Id.*). By written decision dated March 25, 2016, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 61-76). The ALJ's decision became the final decision of the Commissioner on June 6, 2017 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 7, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 41 years old on his alleged onset date and 44 years old on the date of the ALJ's decision. (Tr. at 74). Claimant graduated from high school and attended less than one year of college. (Tr. at 90). Claimant previously worked as a delivery driver and

customer service representative. (Tr. at 112).

## III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent

3

the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 63, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 13, 2013, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "diabetes mellitus, degenerative disc disease (prior laminectomies 2005 and 2008), sleep apnea (but if using CPAP much improved, 18F, page 2), obesity, and status post right rotator cuff surgery (2010)." (Tr. at 64, Finding No. 3). The ALJ considered Claimant's hypertension and affective disorder, but found these impairments to be non-severe. (Tr. at 64-65, Finding No. 3).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 65, Finding No. 4). Accordingly, the ALJ

4

determined that Claimant possessed:

> [T]he residual functional capacity to: lift or carry 20 pounds occasionally and 10 pounds frequently. He can stand for 30 minutes at a time for up to 2 hours in an 8-hour workday. He can walk for 30 minutes at a time for up to 2 hours in an 8-hour workday. He can sit for 2 hours at a time for up to 6 hours in an 8-hour workday. He can push or pull frequently with the upper extremities in the weight limits given for lifting and carrying. He can occasionally operate foot controls. He can occasionally balance, stoop, kneel, climb ramps and stairs. He should not crouch, crawl, use ladders, ropes, or scaffolds. He should not work in temperature extremes or at unprotected heights. He can occasionally be exposed to vibration; humidity; wetness; be around moving mechanical parts; and operate a motor vehicle. He can frequently be exposed to inhaled pulmonary irritants such as: dust, odors and fumes. He can occasionally reach overhead with the dominant right upper extremity.

(Tr. at 66-74, Finding No. 5). At the fourth step, the ALJ determined that Claimant could perform his past relevant work as a customer service representative as the position is generally performed. (Tr. at 74, Finding No. 6). In the alternative, the ALJ found that there were other jobs Claimant could perform. (Tr. at 74-75, Finding No. 6). The ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (*Id.*). The ALJ considered that (1) Claimant was born in 1971 and was defined as a younger individual age 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 74, Finding No. 6). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including the unskilled sedentary work as a ampule sealer, wire patcher, and semi-conductor bonder. (Tr. at 75, Finding No. 6). Consequently, the ALJ

concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 75, Finding No. 7).

IV.    **Claimant's Challenges to the Commissioner's Decision**

Claimant's arguments can be categorized into two challenges to the Commissioner's decision. First, Claimant criticizes the ALJ's analysis of the severity and limiting effects of his back pain, diabetes mellitus, and associated symptoms. (ECF No. 7 at 5-14). Claimant contends that although the ALJ devoted six pages of the decision to restating the medical records, the ALJ did not provide any meaningful analysis explaining how the medical evidence either supported or undermined Claimant's allegations. (*Id.* at 6). According to Claimant, his diagnostic testing results, history of "extensive pain management," and treating physicians' opinions clearly supported his allegations regarding the severity and limiting effects of his back pain and associated symptoms. (*Id.* at 6, 8-11). Regarding his diabetes mellitus, Claimant states that the ALJ failed to compare Claimant's statements regarding peripheral neuropathy and chronic ulcerations to the evidence of record; instead, the ALJ simply concluded that Claimant's uncontrolled diabetes and associated issues would improve if he lost weight and monitored his blood glucose more carefully. (*Id.* at 14). In his second challenge, Claimant contends that the ALJ erred in rejecting the opinions of his treating physicians, Drs. Donatelli and Bird, in favor of giving great weight to the opinion of the non-examining consultative expert, Dr. Pella. (*Id.* at 15-20).

In response to Claimant's challenges, the Commissioner notes that the standard for establishing disability under the Social Security Act is stringent and asserts that the ALJ properly evaluated Claimant's subjective complaints, fully accounted for all of Claimant's credibly-established limitations in the RFC finding, and correctly evaluated

6

the opinion evidence. (ECF No. 13 at 12-26).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information most pertinent to Claimant's challenges is summarized as follows:

### *A. Treatment Records*

#### 1. Before Alleged Onset of Disability

In 2003, Claimant was diagnosed with type 2 diabetes mellitus ("diabetes"). (Tr. at 498). Thereafter, in March 2005, Claimant reported to his medical provider that he suffered from low back pain that radiated into his left leg. (Tr. at 681). Claimant stated that his back pain began six months earlier, but it was more severe in the prior two months. Claimant's MRI showed that he had a herniated disc at his L4-5 spinal segment that was compressing his thecal sac and appeared to be compressing his L5 nerve root. (Tr. at 681). Thus,  Claimant underwent a L4-5 hemilaminectomy and discectomy that year. (Tr. at 256, 630). Claimant reported improvement following surgery. (Tr. at 689). However, in May 2007, Claimant re-injured his back at work while delivering a hospital bed to a customer. (Tr. at 122, 256). Claimant stated that he felt a "pop" in his low back and then felt pain radiating into his legs, particularly in his left leg. (Tr. at 193). Claimant reported numbness and tingling in his left foot, as well as difficulty with standing, sitting, walking, and lying down. (*Id.*). Claimant was diagnosed with a recurrent herniated disk at L4-5 on the left side. (Tr. at 185, 690). His treatment notes stated that conservative measures, such as narcotic medications, physical therapy, and epidural and facet injections did not provide him relief. (Tr. at 193). Therefore, Claimant underwent a repeat left lumbar discectomy at L4-5 on November 5, 2008. (Tr. at 185, 193). Claimant was approved for Worker's Compensation benefits and ultimately received a settlement

payment related to his May 2007 back injury. (Tr. at 123, 128, 905-09).

Claimant returned to work in the same position, delivering and setting up home medical equipment, such as hospital beds. (Tr. at 90-91). However, in January 2010, Claimant fell on his right shoulder at work and sustained a right rotator cuff tear. (Tr. at 498). Due to additional complaints of low back pain, an x-ray was taken of Claimant's lumbosacral spine on January 11, 2010. (Tr. at 567). (*Id.*). Claimant had moderate-to-marked intervertebral joint space narrowing at L4-5 and L5-S1, with spondylosis of the left pars interarticularis of L5 and straightening of the usual lordosis, which was noted to be commonly seen "in low back muscle spasm." (*Id.*).

On January 25, 2011, Claimant began seeing physician's assistant Heather Cook at Bluestone Health Center. (Tr. at 1182). Claimant stated that he was previously treated by another provider and took insulin with no issues, but he lost his insurance and stopped seeing that provider. (*Id.*). Claimant admitted that he had not taken medications or monitored his blood glucose for a "few months" and explained that "he didn't want to know what his glucose readings were." (*Id.*). Claimant was prescribed Glimepiride and metformin. He advised Ms. Cook at his next visit less than a month later, on February 8, 2011, that his glucose readings had improved since he started those medications. (Tr. at 1179, 1184-85). On April 12, 2011, Claimant presented for another diabetic check-up with Ms. Cook and expressed that his blood glucose readings were in the normal range on the weekends because he was "able to watch his diet better." (Tr. at 1167).

Thereafter, after several months of not taking insulin or monitoring his blood glucose, Claimant returned to Ms. Cook on December 2, 2011. (Tr. at 1154, 1159, 1162). Claimant stated that his blood glucose readings were "much lower" since he re-started insulin. (Tr. at 1154). Claimant's morning reading on the date of the visit was reportedly

8

243 mg/dl; however, he stated that some of his readings were around 130 mg/dl.[1] (*Id.*). Claimant also noticed that his readings were better when he ate small meals throughout the day. (*Id.*). On the same day, an x-ray was taken of Claimant's lumbar spine to evaluate his complaints of low back pain that radiated into his left leg. (Tr. at 1153). The x-ray showed no acute lumbar spine abnormality or significant interval change. (*Id.*). Claimant had stable moderate disc space narrowing at L4-5 and L5-S1 and probable left L5 pars defect that all appeared consistent with his previous lumbar x-ray that was taken on January 11, 2010. (*Id.*).

Claimant had another diabetic check-up and medication review with Ms. Cook on March 9, 2012. (Tr. at 1148). Claimant reported that his blood glucose readings were 160 to 210 mg/dl. (*Id.*). He stated that he was out of insulin for a while, but he "restarted [it] now." (*Id.*). He also reported that his diet was "pretty good." (*Id.*). At his next visit with Ms. Cook on June 15, 2012, Claimant told Ms. Cook that his blood glucose readings averaged 180 mg/dl. (Tr. at 1142). He described his diet as "decent" and stated that he decreased his portion sizes. (*Id.*). However, Claimant acknowledged that he still "had a hard time remembering to take his nighttime medications." (*Id.*).

On August 20, 2012, Claimant saw podiatrist. Jim Chianese, D.P.M., at the Foot and Ankle Clinic, regarding an ulcer on his right big toe that first presented in January 2011. (Tr. at 1025, 1174, 1176-77). The ulcer measured ten millimeters in diameter and two millimeters deep and extended only into the subcutaneous tissue, leaving the surrounding tissue intact. (*Id.*). Dr. Chianese diagnosed Claimant with a diabetic ulcer and prescribed the antibiotic Keflex. (*Id.*). Claimant's diabetic insoles were also modified to "off load the

---

[1] The target glycemic goals for an adult with diabetes are generally 80 to 130 mg/dl before a meal and less than 180 mg/dl within one to two hours after a meal. http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/checking-your-blood-glucose.html

ulcer." (*Id.*).

During Claimant's next visit at the Foot and Ankle Clinic on September 19, 2012, Claimant saw another podiatrist, Tim Donatelli, D.P.M. (Tr. at 1026). Claimant's ulcer was epithelizing. (*Id.*). Claimant followed up with Ms. Cook shortly thereafter, on September 21, 2012, for a diabetic check-up. Claimant reported that his blood glucose readings were 150 to 250 mg/dl and reiterated that he was "good about" taking his morning medications, but was not consistently taking his medications at night. (Tr. at 1137). Claimant believed that his morning readings were high due to him not taking his evening medications. (*Id.*). Claimant was continued on Glimepiride, Lantus, metformin, and Januvia. (Tr. at 1140).

On October 16, 2012, Claimant again saw Ms. Cook and complained of warmth, erythema, and discomfort in his right lower leg that began that morning. (Tr. at 1133). His right leg was examined by doppler ultrasound, but there was no evidence of deep vein thrombosis. (Tr. at 1132). Claimant then presented to Dr. Donatelli on January 2, 2013 for follow-up regarding the ulcer on his right big toe. (Tr. at 1028). Dr. Donatelli debrided the wound. (*Id.*).

On December 27, 2012, Claimant presented for another appointment with Ms. Cook. He stated that his blood glucose readings ranged from 200 to 240 mg/dl. (Tr. at 1126). However, Claimant conceded that he had a hard time remembering to take his nighttime medications, which included an oral diabetic medication and cholesterol-lowering drug. (*Id.*). Ms. Cook recommended adding a meal-time insulin medication to Claimant's regimen, but Claimant declined and instead agreed to increase his dosage of Levemir and start taking his medications at night. (Tr. at 1129).

On April 29, 2013, Claimant followed up with Ms. Cook and reported that his blood

glucose readings were "high," but that he had not checked his blood glucose in a while because he knew that it was bad, and he did not want to know the readings. (Tr. at 1118). Claimant was also taking less of his insulin to "help spread it out over time" because he "applied for indigent and was denied." (*Id.*). Claimant was still not taking his nighttime medications because he did not remember to take them. (*Id.*). Claimant was given a prescription for Lantus vials because it appeared to be a cheaper medication and was also given samples of the drug. (Tr. at 1121).

### 2. After Alleged Onset of Disability

On July 24, 2013, Claimant presented to Dr. Donatelli, regarding a 10 millimeter ulcer on his left foot below the metatarsal head that began as a blister one month earlier but had worsened since that time. (Tr. at 1019). The ulcer was in the subcutaneous tissue and did not probe to bone depth. (*Id.*). The surrounding skin was erythematous. (*Id.*). Dr. Donatelli debrided the ulcerated area, dressed the wound, and prescribed Bactrim and Ciproflaxin. (Tr. at 1020). Claimant weighed 305 pounds at this visit and still had some skin ulceration on his right foot. (Tr. at 1019). Claimant followed up with Dr. Donatelli again on July 31, 2013. (Tr. at 1022). Dr. Donatelli again debrided the ulcer on Claimant's left foot and continued Claimant on medications. (*Id.*).

Claimant saw Ms. Cook on August 5, 2013 and reported that his blood glucose readings were around 240 mg/dl. (Tr. at 1110). Ms. Cook started Claimant on Novolog on a sliding scale and adjusted his dosage of Levemir. (Tr. at 1113.). When Claimant saw Dr. Donatelli two days later, on August 7, 2013, Dr. Donatelli advised Claimant to "limit weight bearing as much as possible as it [was] evident from the wound that [Claimant had] been on the foot a great deal due to excessive formation of hyperkeratotic wound callous." (Tr. at 1024). Dr. Donatelli also advised Claimant that "continued

11

noncompliance place[d] [him] at risk for eventual amputation of the extremity." (*Id.*). Claimant was instructed to wear an appropriate "shoe/boot to off load the wound" and to maintain "tight glycemic control" given the adverse effects that elevated blood sugar had on wound healing. (*Id.*).

Claimant saw Dr. Donatelli again a week later, on August 14, 2013, and Claimant's ulcer was the same size. (Tr. at 1048). Claimant was continued on Keflex, restarted on Ciprofloxacin, and dispensed an orthowedge shoe. (*Id.*). Claimant reported to Dr. Donatelli at his next visits, on August 21 and September 4, 2013, that his skin ulceration was improving. (Tr. at 1050-53).

Claimant followed up with Ms. Cook on September 11, 2013. He reported that his blood glucose readings were much better after his medication was adjusted and his readings were now in the 130 to 170 mg/dl range. (Tr. at 1105). However, Claimant admitted that he sometimes forgot to take Novolog with meals. (*Id.*). Ms. Cook continued Claimant on his current medications. (Tr. at 1108).

On October 16, 2013, Claimant stated to Dr. Donatelli that the skin ulceration on his left foot was moderate and worsening. (Tr. at 1054). Dr. Donatelli debrided the ulcer and continued Claimant on Keflex. (Tr. at 1055). The next month, on November 20, 2013, Claimant saw Ms. Cook and stated that his glucose readings were around 180 mg/dl, but he was not taking his meal-time insulin, Novolog. (Tr. at 1092). At this visit, Claimant did not have any musculoskeletal symptoms, weighed 317 pounds, and had ulcers on his feet. (Tr. at 1092, 1094). He was continued on medications. (Tr. at 1095-96).

On February 27, 2014, Claimant again saw Ms. Cook for a diabetic check-up. Claimant conceded that he did not take his diabetes medications for the past five or six weeks, other than taking some morning doses. (Tr. at 1080). Claimant explained that he

12

was having a "pity party." (*Id.*). Claimant weighed 311 pounds, which was obese, although he recently lost five pounds. (Tr. at 1082). On examination, Claimant had lesions, mild erythema, and warmth on his lower right leg. (Tr. at 1083). Claimant was continued on his diabetes medications, his dosage of Neurontin was increased for his diabetic peripheral neuropathy, and he was prescribed the antibiotic Bactrim. (Tr. at 1084).

Claimant began seeing a new primary care provider, Ryan Runyon, D.O, at Princeton Family Medicine, on May 20, 2014. Claimant stated that his fasting blood glucose was ranging in the "high 200s." (Tr. at 1193). Claimant was not using Novolog regularly, but he was using his long-acting insulin Levemir. (*Id.*). He reported tingling, stinging, and stabbing pain in his lower extremities with trace edema in those areas. (Tr. at 1194). Claimant also reported chronic low back pain that extended into his hips and tailbone, which he rated two on a ten-point pain scale at all times and eight at its worst. (*Id.*). The pain was described as "sharp" and worse with activity. (*Id.*). Claimant weighed 221 pounds and had an ulcer on his right big toe. (*Id.*). Dr. Runyon adjusted Claimant's diabetes medications and continued Claimant's prescription for Silvadene cream for Claimant's ulcer. (Tr. at 1194-95). Claimant's hemoglobin A1c was measured two days later and it was recorded as 10.4, which was noted to be high.[2] (Tr. at 1191).

On July 9, 2014, Claimant saw neurologist Tahir I. Rana, M.D., to evaluate Claimant's reported persistent numbness in his feet and burning and tingling in his lower legs. (Tr. at 1223). Claimant stated that he tried Neurontin for diabetic neuropathy, but it made the tingling worse. (*Id.*). On examination, Claimant had a stocking pattern sensory deficit in the lower one-third of his legs, vibration and ankle jerks were absent in his toes

---

[2] The A1C is a blood test that provides an estimated average of what a person's blood sugar was over the prior two to three months. A result above 7 is considered elevated for an adult with diabetes. https://www.thediabetescouncil.com/ultimate-guide-to-the-a1c-test-everything-you-need-to-know/

bilaterally, and his gait was mildly antalgic. (Tr. at 1224). Dr. Rana found that Claimant had "possible diabetic neuropathy." (*Id.*).

On August 13, 2014, Claimant followed up with Dr. Runyon and stated that his blood glucose was averaging 285 mg/dl, but he admitted that he only used Levemir in the morning, rather than twice per day, and he only occasionally used Novolog. (Tr. at 1190). Claimant was switched to a Levemir Flex Pen to use once daily, again prescribed Novolog to take at meal times, and instructed to continue metformin and Januvia. (*Id.*).

Claimant saw Dr. Runyon again on October 20, 2014. Claimant's fasting blood glucose was ranging from 102 to 266 mg/dl before lunch and 148 to 307 mg/dl at bedtime. (Tr. at 1279). Claimant was taking Levemir, metformin, and Januvia, but he had not used Novolog for two weeks. (*Id.*). Claimant also took Lyrica and Cyclobenzaprine for his atypical facial pain and diabetic peripheral neuropathy. (*Id.*). On examination, Claimant had +1 edema in his lower extremities and weighed 314 pounds, which was a four-pound weight gain from his prior visit. (*Id.*). Claimant's medications were adjusted, and he was scheduled for a follow-up appointment in two weeks. (*Id.*).

At Claimant's next visit with Dr. Runyon on November 5, 2014, Claimant stated that he was taking his medications, but was not following a strict diabetic diet. (Tr. at 1278). Claimant had gained six pounds in just over two weeks and weighed 320 pounds. (*Id.*). He had trace lower extremity edema. (*Id.*). Dr. Runyon again adjusted Claimant's medications and instructed him to follow an 800 kilocalorie diabetic diet. (*Id.*).

On December 1, 2014, Claimant followed up with Dr. Rana, stating that he continued to have intermittent burning and tingling in his legs. (Tr. at 1211). Dr. Rana increased Claimant's dosage of Cymbalta. (Tr. at 1213). Claimant's gait was noted to be normal at this visit. (Tr. at 1212). The following week, on December 8, 2014, Claimant

presented to Dr. Runyon and admitted that he stopped taking two of his three daily doses of Novolog and stopped checking his blood glucose approximately one month earlier. (Tr. at 1277). Claimant expressed that he had occasional difficulty with balance, which he attributed to diabetic peripheral neuropathy. (*Id.*). He also reported pain in his hips and back and had an ulcer on his right big toe. (*Id.*). Claimant had trace lower extremity edema and weighed 311 pounds, which was a loss of nine pounds. (*Id.*). Dr. Runyon adjusted Claimant's dosages of Lantus and Novolog and renewed his prescriptions for metformin and Januvia. (*Id.*).

On December 16, 2014, Claimant had a cervical spine MRI, which showed mild findings, other than a moderate C5 "right posterolateral disc bulging and indentation of the right antral lateral thecal sac and under surface of the right nerve root sleeve." (Tr. at 1233). Early the next year, on February 2, 2015, Claimant presented to William Bird, M.D., at Bluestone Medical Center "for disability papers to be filled out." (Tr. at 1284). The only physical examination findings noted were Claimant's vitals. (Tr. at 1285-86). Claimant weighed 320 pounds. (Tr. at 1286).

On March 13, 2015, Claimant told Dr. Runyon that he essentially stopped taking his insulin until two weeks earlier when his blood glucose was over 600 mg/dl. (Tr. at 1276). Claimant expressed that his left-sided facial pain flared up when he was more compliant with his medications. (*Id.*). Claimant weighed 311 pounds and had trace edema in his lower extremities. (*Id.*). Dr. Runyon adjusted Claimant's diabetes medications and had a "long discussion" with Claimant regarding his diet. (*Id.*). Claimant's osteoarthritis was stable, and Dr. Runyon noted that Cymbalta would possibly be reinitiated in the future for Claimant's low back pain. (*Id.*).

On May 8, 2015, Claimant again saw Dr. Runyon. (Tr. at 1274). Claimant reported

15

that his blood glucose averaged 225 mg/dl over the prior two weeks and stated that he was taking his medications, but he was not following a strict diet. (*Id.*). Claimant weighed 315 pounds, which was a gain of one pound, but he had no lower extremity edema at this visit. (*Id.*). Dr. Runyon increased Claimant's dosages of Novolog and Lantus and changed Claimant's prescription for Januvia to Glyxambi. (*Id.*).

On June 1, 2015, Claimant saw neurologist, John Green Malone, M.D., for left-sided facial pain and paresthesias, which began approximately one year earlier. (Tr. at 1319). Dr. Malone noted that during Claimant's examination last November, he had significant sensory loss in his lower extremities and was essentially areflexic. (*Id.*). However, Claimant was now back on Cymbalta and was doing well with significant improvement in his facial symptoms. (*Id.*). On examination, Claimant's gait was stable, his motor examination was normal, his deep tendon reflexes were 1+ in his arms and 2+ at his knees, and he had only trace edema at his ankles. (*Id.*). Claimant was continued on Cymbalta for his facial symptoms. (Tr. at 1320).

On July 20, 2015, Claimant followed up with Dr. Runyon and admitted that he had not "really checked [his blood glucose] at all over the last three months." (Tr. at 1273). Claimant also did not take his medications for the prior several weeks. (*Id.*). Nonetheless, Claimant had tried to "limit sweets" and weighed 303 pounds, which was a loss of 12 pounds. (*Id.*). Claimant was restarted on Novolog, his dosage of Lantus was adjusted, and he was continued on Glyxambi. (*Id.*).

At Claimant's next visit with Dr. Runyon on August 24, 2015, Claimant conceded that he was only taking Novolog with breakfast and skipping his next two doses each day. (Tr. at 1314). He was also taking one of his two daily doses of Lantus, but believed he was taking his Glyxambi. (*Id.*). Claimant reported that his fasting blood glucose before lunch

16

was ranging from 157 to 288 mg/dl and his blood glucose was ranging from 162 to 232 mg/dl before dinner. (*Id.*). Dr. Runyon adjusted Claimant's medications and advised him to check his blood glucose more frequently. (*Id.*).

On September 24, 2015, Dr. Chianese performed a plantar condylectomy on Claimant's right big toe in order to relieve pressure and allow the ulcer to heal. (Tr. at 1303). Dr. Chianese noted that conservative measures, such as local wound care and offloading, did not heal the ulcer. (*Id.*). Therefore, surgery was recommended. (*Id.*). Claimant followed up with Dr. Chianese four days after his condylectomy. The operative site was healing well with a 50 percent improvement in Claimant's ulcer. (Tr. at 1300). An x-ray of Claimant's right foot taken the same day showed no abnormalities and adequate osseous reaction at the joint. (*Id.*).

Thereafter, on October 12, 2015, Claimant saw Dr. Chianese for his seven-week follow-up appointment. (Tr. at 1295). Claimant's symptoms were improved; he had no post-operative complications, and he was weight-bearing as tolerated. (*Id.*). Dr. Chianese debrided the partial-thickness ulcer on Claimant's right foot and the ulcer on Claimant's left foot was noted to be "limited to breakdown of skin." (Tr. at 1296). Claimant was also molded for diabetic shoes. (*Id.*).

On November 9, 2015, Claimant followed up with Dr. Malone regarding his left facial pain, diabetic neuropathy, and restless leg syndrome. (Tr. at 1316). Claimant was not taking any medications for the issues and it was noted that he failed treatment with Neurontin, Lyrica, and Cymbalta. (*Id.*). His motor examination was normal, and his gait was stable and independent. (*Id.*). However, Claimant had trace deep tendon reflexes and his sensation was reduced to vibration and temperature distally. (*Id.*). Dr. Malone prescribed Keppra and advised Claimant to return for follow up in one year or sooner, if

17

needed. (*Id.*).

In April 2016, Claimant was referred to Jamal Sahyouni, M.D., at the Clinch Valley Medical Center Advanced Wound Center regarding the ulcer on the plantar aspect of Claimant's right foot that he had for the past four months. (Tr. at 41). Dr. Sahyouni debrided the ulcer on Claimant's right foot on several occasions in May. (Tr. at 26, 30, 35). On June 3, 2016, Dr. Sahyouni, noted that the wound was still open and exposing the muscle underneath, but there was no tunneling or undermining. (Tr. at 16). Claimant was diagnosed with a non-pressure chronic ulcer with necrosis of muscle that was noted to be a complication of Claimant's diabetes. (Tr. at 17). Dr. Sahyouni again debrided the skin and sub-cutaneous tissue in the area of the wound and instructed Claimant regarding wound care and advised him to wear an off-loading device when walking. (Tr. at 17-18).

### *B. Evaluations and Opinions*

On October 28, 2013, A. Rafael Gomez, M.D., assessed Claimant's RFC based upon a review of his records. Dr. Gomez concluded that Claimant could perform light-level work, including standing and/or walking for a total of six hours and sitting for a total of six hours in an eight-hour workday, occasional postural activities, and no concentrated exposure to temperature extremes, vibration, or hazards. (Tr. at 754-56).

On November 4, 2013, Ms. Cook completed a physician's summary regarding Claimant. Ms. Cook noted that Claimant's diagnoses included, *inter alia*, a diabetic ulcer and uncontrolled diabetes. (Tr. at 1097). She noted that his prognosis was "fair" and that it was unknown how long his incapacity/disability was expected to last. (*Id.*). In regard to employment limitations, Ms. Cook stated that Claimant was unable to stand for long period due to his diabetic ulcer and could not work in mines or driving a truck due to his use of insulin. (*Id.*).

Rabah Boukhemis, M.D., affirmed Dr. Gomez's RFC assessment on January 31, 2014. (Tr. at 785-87). Dr. Boukhemis considered Claimant's updated medical records, including Claimant's treatment records from Ms. Cook and Dr. Donatelli, but Dr. Boukhemis concluded that there was no new evidence that reduced Claimant's RFC. (Tr. at 784, 786).

On April 16, 2014, Dr. Donatelli completed a medical opinion form regarding Claimant's ability to do work-related activities. Dr. Donatelli stated that Claimant could perform work at the light exertional level and had no sitting restrictions, but Dr. Donatelli marked that Claimant could only stand and walk for a total of less than two hours in a work day. (Tr. at 1057). In response to subsequent questions, Dr. Donatelli marked that Claimant could stand or walk for "0 minutes" and he noted three times that Claimant should do "no standing/walking" due to chronic ulceration. (Tr. at 1057-58).

On February 2, 2015, Dr. Bird likewise completed a medical opinion form regarding Claimant's ability to do work-related activities. Dr. Bird opined that Claimant could lift and carry less than ten pounds, stand and walk for less than two hours, and sit for about four hours in an eight-hour workday. (Tr. at 1236). Also, Dr. Bird noted that Claimant could only sit for 20 minutes and stand for ten minutes before changing positions. (Tr. at 1236-37). Dr. Bird further found that Claimant would need to walk around every 20 to 30 minutes for five minutes each time, have the opportunity to sit or stand at will, and would need to lie down once during a work shift. (Tr. at 1237).

On June 18, 2015, John A. Pella, M.D., also completed a form concerning Claimant's ability to do work-related activities. Dr. Pella opined that Claimant could perform light-level work that required him to sit for no more than two hours at one time for a total of six hours in a work day, stand for no more than 30 minutes at one time for a

total of two hours in a work day, and walk for 15 to 30 minutes at one time for a total of two hours in a work day. (Tr. at 1245-46). Dr. Pella based such restrictions on Claimant's low back pain and neuropathy. (*Id.*). Dr. Pella further opined that Claimant could only frequently reach overhead and push/pull due to his low back pain, history of rotator cuff surgery, and cervical spondylosis; occasionally operate foot controls based upon his neuropathy and low back pain; and occasionally perform postural activities, except that he could never climb ladders or scaffolds, crouch, or crawl due to his neuropathy and low back pain. (Tr. at 1247-48). Finally, Dr. Pella opined that, based upon his neuropathy, Claimant could only occasionally tolerate environmental conditions except that he could frequently tolerate dusts, odors, fumes, and pulmonary irritants and could never be exposed to unprotected heights or temperature extremes. (Tr. at 1249).

### C. Claimant's Statements

Claimant testified at his administrative hearing on February 12, 2016 that he worked from 2000 to 2010 or 2011 delivering home health care equipment, but his employer moved him into a customer service position after he fell at work and injured his shoulder. (Tr. at 90, 103-04). Claimant stated that he remained in the customer service position for two or three years but realized on June 13, 2013 that he could not do it any longer. (Tr. at 90, 92). According to Claimant, he was getting behind at work and was no longer a good employee. (Tr. at 92). He believed that if he did not quit, he "would have probably got fired after a while." (*Id.*).

In terms of his impairments, Claimant noted the effects of his diabetes, including that he felt tired a lot, could not feel his feet, and had chronic ulcers on his right foot for the past six years. (Tr. at 95, 98). Claimant testified that he currently had an ulcer on his right big toe, but he conceded that it was partially healed, and he followed up with his

physician every two weeks for it to be cleaned to promote continued healing. (Tr. at 92-93). Claimant stated that he also had an ulcer on the padding of his right foot behind his big toe, which his physician just debrided. (Tr. at 93). According to Claimant, he checked and cared for his feet six to eight times per day for ten to fifteen minutes each time, which included visually inspecting his feet, applying a cream, and wrapping padding around the ulcers. (Tr. at 93, 96-97). Claimant stated that he wore socks at all times unless he left the house in which case he wore diabetic shoes. (Tr. at 96).

Regarding compliance with taking his medications, Claimant stated that when he missed his evening doses of his diabetes medications it was generally because he was sleeping, or he chose not to take it because he had not eaten, and he did not want his blood glucose to drop. (Tr. at 94). Claimant stated that standing curtailed healing of his ulcers and caused back pain that radiated into his hips and buttocks. (Tr. at 97, 101). He asserted that he could only stand for five or ten minutes before his back began to hurt; walk for approximately 200 yards before he was "done for the day" and had to lie down or sit down for relief; and sit for 30 to 45 minutes before he had to stand up. (Tr. at 101-02).

Claimant testified that his daily activities included a lot of sleeping. He stated that he slept from 9:30 p.m. to 6:15 a.m. and then napped during the day for an average of 12 to 14 hours of sleep per day. (Tr. at 104). Claimant expressed that he supervised his nine-year-old son getting ready for school, spent time with his wife until she went to work, and then napped. (Tr. at 104-05). During the day, he sat in the recliner, did laundry, and prepared simple meals. (Tr. at 106). He also mowed the lawn using a riding mower, but he could not physically do housework or weed-eating. (Tr. at 106). Claimant testified that he was in pain for days after mowing the lawn because of the bumping and vibration and prolonged sitting involved. (*Id.*). He stated that he could no longer pursue his hobby of

hunting and had not hunted in three years. (Tr. at 107-08). Finally, Claimant admitted that he continued to drive to medical appointments and church, but stated that he felt unsafe driving because of the numbness in his feet. (Tr. at 108).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir.

2005) (citing *Craig*, 76 F.3d at 589).

## VII. <u>Discussion</u>

As noted above, Claimant challenges (1) the ALJ's analysis of the credibility of his statements concerning the intensity, persistence, and limiting effects of his diabetes mellitus, back pain, and associated symptoms and (2) the weight that the ALJ assigned to some of the medical opinions offered in this case. These arguments are considered below, in turn.

### *A. Credibility Analysis*

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and

severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5.

In its rulings, the SSA provides further guidance on how to evaluate a claimant's credibility, stating, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the

24

purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ performed the two-step analysis to assess the credibility of Claimant's statements. The ALJ considered Claimant's allegations that sitting, standing, or walking exacerbated his back pain and that he remained tired, was unable to feel his feet, and had to constantly treat ulcers on his feet due to diabetes and associated neuropathy. (Tr. at 67). The ALJ specifically noted Claimant's statements that "[n]othing he has tried for back pain has worked, including pain management, injections before surgery, liniments/rubs/patches, exercises, etc." (*Id.*). The ALJ also evaluated Claimant's

assertion that he stopped working due to the prolonged sitting and reaching required to do his office job, as well as Claimant's contention he could not perform the necessary care for his feet throughout the day in a work setting. (*Id.*). The ALJ acknowledged that Claimant had not been ulcer-free in six years and that his doctor warned him that he risked amputation if the ulcers reached his bones. (*Id.*). Upon consideration of the evidence, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (*Id.*). Nevertheless, the ALJ weighed Claimant's allegations against the objective evidence and opinions offered in the matter and concluded that Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible for the following reasons. (*Id.*).

Regarding Claimant's back pain and associated symptoms, the ALJ noted that in March 2011, Claimant had no sensory abnormalities and his gait, stance, and reflexes were normal. (Tr. at 68). The ALJ cited that Claimant's lumbar spine x-ray that was taken in December 2011 showed no significant changes when compared to his earlier examination in January 2010. (*Id.*). The ALJ remarked that Claimant again demonstrated a normal gait in March 2014 and, although Claimant showed a stocking type sensory deficit in the lower one-third of his legs, no response to vibration in his toes, no ankle jerks, and a mildly antalgic gait in July 2014, Claimant had normal proprioception and a normal tandem gait at that time. (Tr. at 69-70). The ALJ cited the mild results of Claimant's December 2014 cervical spine MRI with the exception of a moderate disc bulge at C5-6 and indentation of the right antral lateral thecal sac and under surface of the right nerve root sleeve. (Tr. at 70). However, as the ALJ discussed, Dr. Malone reviewed the MRI and stated that there was no reason to consider neck surgery and the results did not

typically explain Claimant's alleged left-sided neck and upper chest symptoms. (*Id.*).

As to Claimant's diabetes and associated conditions, the ALJ particularly emphasized Claimant's persistent failure to properly monitor his blood glucose, take his medications, follow a proper diet, or lose weight as advised by his physicians. (Tr. at 68-71, 73). The ALJ cited treatment notes indicating that Claimant's blood glucose levels "were better" when he followed a better diet and took his prescribed medications. (Tr. at 68). Conversely, the ALJ cited records indicating that Claimant's diabetes remained uncontrolled when Claimant was non-compliant with medical treatment, such as instances in which Claimant did not take his medications for several weeks. (Tr. at 71). Ultimately, the ALJ found that Claimant's persistent medical non-compliance caused his health to deteriorate, but his condition could be significantly better if Claimant followed the recommendations of his treating physicians and nurses. (Tr. at 73).

In assessing the credibility of Claimant's subjective symptoms, the ALJ also considered Claimant's daily activities, including caring for his son, preparing simple meals, doing laundry, using a riding mower, watching television, and attending cookouts. (Tr. at 64). Finally, the ALJ gave great weight to the opinion of the non-examining medical expert, Dr. Pella, who concluded that Claimant could do a reduced range of light work. (Tr. at 73).

Overall, after considering Claimant's statements, the treatment records, and the opinion evidence, the ALJ concluded that Claimant's impairments imposed various limitations, but that Claimant retained the capacity to perform a very limited range of light work that did not require Claimant to stand for more than 30 minutes at a time for two hours total in a workday; walk for no more than 30 minutes at a time for two hours total in a workday; sit for no more than two hours a time for a total of six hours in a

workday; never crouch, crawl, or climb ladders, ropes, or scaffolds; perform other postural activities and operate foot controls no more than occasionally. (Tr. at 66).

Claimant contends that the ALJ failed to meaningfully address whether the evidence supported Claimant's allegations regarding his back pain and associated symptoms. However, as shown above, the ALJ clearly explained his conclusions that Claimant's radiological findings did not demonstrate any significant worsening of Claimant's back impairments following his alleged onset of disability. Moreover, the ALJ cited daily activities that Claimant was able to perform despite his alleged pain, as well as the results of Claimant's physical examinations.

The ALJ's conclusions regarding Claimant's back pain, radicular symptoms, and neuropathy are supported by substantial evidence. While the majority of Claimant's records during the relevant period focused on his diabetes and associated symptoms, Claimant reported chronic back pain in May 2014, which Claimant stated extended into his hips and tailbone and was worse with activity. (Tr. at 1194). Nonetheless, as noted by the ALJ, Claimant lumbar x-ray in December 2011 showed that his condition was stable in comparison to his x-ray in January 2010. (Tr. at 1153). Both x-rays were taken when Claimant was gainfully employed, and he did not provide any subsequent radiographic studies demonstrating that his condition significantly deteriorated after that time. Rather, in June 2015, Claimant's gait was stable, his motor examination was normal, and his deep tendon reflexes were normal at his knees. (Tr. at 1319). In November 2015, Claimant's motor examination was again normal, and his gait was stable and independent, although his sensory and reflexive responses were reduced. (Tr. at 1316). Therefore, there is very clearly more than a scintilla of evidence to support the ALJ's analysis that while Claimant's back pain imposed certain limitations, it was not disabling,

as Claimant stated.

Furthermore, the ALJ correctly analyzed the limitations imposed by Claimant's diabetes, neuropathy, and ulcers. Claimant contends that the ALJ disregarded "the obvious severe standing and walking limitations posed by [Claimant's] diabetic peripheral neuropathy and chronic ulcerations" and instead acted "as a self-appointment medical expert, concluding without the benefit of a medical expert opinion that [Claimant] would not suffer from neuropathy and ulcerations if he would simply lose weight and monitor his blood sugar more closely." (ECF No. 7 at 13, 14). To the contrary, the ALJ very clearly considered the relevant evidence and provided well-reasoned support for his findings regarding Claimant's restricted ability to stand and walk.

The ALJ acknowledged that Claimant was treated for frequent diabetic skin ulceration on both feet during the relevant period and was treated by his podiatrist, Dr. Donatelli. (Tr. at 69). The ALJ noted that treatment for Claimant's ulcers included debridement; the use of antibiotics, such as creams; and a plantar condylectomy to relieve pressure and allow the persistent ulcer on Claimant's right big toe to heal. (Tr. at 69, 71). As cited by the ALJ, Dr. Donatelli advised Claimant to maintain "tight glycemic control," given the adverse effects of elevated blood sugar on wound healing; limit weight-bearing as much as possible; and wear an off-loading shoe. (*Id.*). Yet, the ALJ cited that Claimant's ulcers never probed to bone depth. (Tr. at 69). In addition, the ALJ remarked upon the fact that Claimant did not even require the use of an assistive device to ambulate. (Tr. at 72).

The ALJ cited Claimant's diagnosis of diabetic neuropathy and his treatment with Cymbalta, cyclobenzaprine, and Lyrica. (Tr. at 69, 70). However, the ALJ noted that Claimant did not tolerate an increase in Cymbalta and abruptly stopped taking the

medication. (Tr. at 71). The ALJ discussed that in November 2015, despite Claimant's diabetic neuropathy and discontinuance of Cymbalta, Claimant was medically stable other than a healing ulceration on his right big toe. (Tr. at 72). Indeed, although Claimant had reduced reflexes and sensation, Claimant had full motor strength and a stable and independent gait in November 2015. (Tr. at 1316).

Further, contrary to Claimant's assertion, the ALJ never expressed an opinion that medical compliance would cure Claimant's diabetes and associated symptoms. (ECF No. 7 at 13). Rather, the ALJ stated, based upon specific citations to the record, which included Claimant's own statements to his medical providers, that Claimant's condition was improved when he followed his treatment plan. This conclusion is supported by substantial evidence. Indeed, Claimant conceded that his blood glucose was lower when he "watched" his diet and took his medications as prescribed. Thus, the ALJ reasonably concluded that Claimant's non-compliance diminished the credibility of his statements concerning the intensity, persistence, and limiting effects of his symptoms. While Claimant sometimes stated that he did not take insulin due to financial reasons or side effects, he did not offer any valid reason for failing to check his blood glucose level— instead admitting that he simply did not want to know the readings—and he provided no justification for not following his diabetic diet or losing weight in order to improve his health. Claimant's willful non-compliance with diabetic treatment that is prevalent in the record provided a valid basis for the ALJ to discount Claimant's allegations of disabling symptoms. *Dunn v. Colvin*, 607 F. App'x 264, 276 (4th Cir. 2015) (holding that "the ALJ could reasonably have determined that the severe symptoms Appellant described were inconsistent with her failure to fully comply with the treatment her physicians prescribed" and the Court "may not re-weigh conflicting evidence, make credibility determinations,

or substitute our judgment for that of the ALJ") (citations and marking omitted). At any rate, Claimant's non-compliance was only one of the factors that the ALJ considered in evaluating Claimant's allegations. *Id.* ("In any event, the ALJ did not deny Appellant benefits solely because of the evidence of her non-compliance. Rather, Appellant's non-compliance was merely one of a number of factors the ALJ considered in determining that Appellant's testimony about her symptoms was only partially credible.").

As shown above, the ALJ considered the entire record in assessing the severity and limiting effects of Claimant's impairments. Therefore, the undersigned **FINDS** that the ALJ complied with applicable law in analyzing Claimant's diabetes, back pain, and associated symptoms.

### B. Weight Assigned to Medical Opinions

Claimant further challenges the Commissioner's decision on the basis that the ALJ improperly weighed the medical opinions offered in this matter from Drs. Donatelli, Bird, and Pella. (ECF No. 7 at 15-20). When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1),

416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.*

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[3] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the

---

[3] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.[4]

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special

---

[4] Although 20 C.F.R. §§ 404.1527(c), ), 416.927(c) provide that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), ), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at \*2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at \*3.

In this case, the ALJ considered the April 2014 medical opinion submitted by Claimant's podiatrist, Dr. Donatelli. (Tr. at 72). Dr. Donatelli found that Claimant could perform work at the light exertional level with no restriction on his ability to sit but could not stand or walk due to chronic ulceration in his feet. (Tr. at 1057-58). Dr. Donatelli further stated that Claimant would miss an average of two days of work per month due to his impairments or treatment. (Tr. at 1059).

In weighing Dr. Donatelli's opinion, the ALJ concluded that the restriction from any standing or walking was unsupported by the record. (Tr. at 72). The ALJ noted that Claimant was not bed-ridden, as such a restriction would suggest. Indeed, he did not even require an assistive device to ambulate, and his ability to stand and walk for limited periods of time was proven during his doctors' visits and at the administrative hearing. (*Id.*). Furthermore, the ALJ found that Dr. Donatelli's opinion that Claimant could not stand or walk was inconsistent with Dr. Donatelli's assessment that Claimant could perform light exertional work. (*Id.*). Finally, the ALJ found no support in the record for Dr. Donatelli's statement that Claimant would miss work twice per month due to his ulcers. (*Id.*). For these reasons, the ALJ assigned little weight to Dr. Donatelli's opinion. (*Id.*).

34

The ALJ's above analysis is supported by substantial evidence. Despite the fact that Dr. Donatelli was Claimant's treating podiatrist and his opinion would normally be assigned controlling weight, the record is devoid of evidence that Claimant's ulcers completely precluded him from standing and walking, as Dr. Donatelli assessed. In fact, Claimant's activities of daily living and examination findings explicitly proved that Claimant could stand and walk independently for some amount of time. While Dr. Donatelli advised Claimant in August 2013 to limit weight bearing as much as possible due to his ulcer, there is not a single record from Dr. Donatelli or any other source, including Claimant's own statements, to indicate that Claimant was completely precluded from standing or walking.

Claimant argues that the ALJ misinterpreted Dr. Donatelli's opinion and that Dr. Donatelli meant to express that Claimant should limit weight bearing as much as possible when he has an ulcer, which would have been consistent with Dr. Donatelli's treatment note. (ECF No. 7 at 16). Claimant undertakes a lengthy analysis of what Claimant believes that Dr. Donatelli intended to convey in his medical source opinion. (*Id.* at 16-18). However, it is not within the province of this Court, nor is it Claimant's role, to interpret and weigh medical opinions. That responsibility rests with the Commissioner. In any event, there was no ambiguity in Dr. Donatelli's opinion. The check-box form that Dr. Donatelli completed provided several options for the physician to select regarding Claimant's maximum ability to stand and walk during a workday. (Tr. at 1057). Dr. Donatelli selected the most restrictive response that was available to the question, which stated that Claimant could stand and walk for less than two hours. (*Id.*). That question did not provide Dr. Donatelli the option to select that Claimant could not stand or walk at all. (*Id.*). Thus, Dr. Donatelli very clearly subsequently noted on the form that Claimant

35

could stand or walk for "0 minutes" and he wrote three times that Claimant could not stand or walk. (Tr. at 1058-59). Therefore, the ALJ correctly interpreted Dr. Donatelli's opinion and gave the opinion little weight given its vast inconsistency with the record.

The ALJ further found no support in the record for Dr. Donatelli's conclusion that Claimant would miss work twice per month due to his ulcers. Claimant does not cite to any evidence that supports such a limitation, and Dr. Donatelli did not provide any explanation for his statement. As noted by the ALJ, Claimant was able to maintain activities of daily living, attend doctors' appointments, and appear at the administrative hearing despite his ulcers. Furthermore, there is no indication that Claimant's treatment for ulcers would require him to miss work twice monthly, as Dr. Donatelli suggested. Claimant went to scheduled follow-up appointments with Dr. Donatelli, as opposed to emergencies or unforeseen events that would require him to miss at least two full days of work per month. *See, e.g., Bailey v. Berryhill*, No. 3:17-CV-01365, 2018 WL 2091358, at *23 (S.D.W. Va. Apr. 10, 2018), *report and recommendation adopted,* 2018 WL 2090479 (S.D.W. Va. May 4, 2018). For all of the above reasons, the undersigned finds that the ALJ's analysis of Dr. Donatelli's opinion is supported by substantial evidence.

Claimant further argues that the ALJ improperly assigned no weight to the opinion of Dr. Bird. Dr. Bird submitted an opinion in February 2015 stating that Claimant could perform sedentary work that involved standing and walking for less than two hours and sitting for about four hours in a workday. (Tr. at 1236). Dr. Bird also expressed that Claimant could only sit for 20 minutes and stand for ten minutes before changing positions, would need to walk around every 20 to 30 minutes for five minutes each time, have the opportunity to sit or stand at will, and would need to lie down once during a work shift. (Tr. at 1236-37).

In reviewing Dr. Bird's opinion, the ALJ noted that although Claimant was treated at Bluestone Health Center, there were no clinical records showing that *Dr. Bird* had ever treated Claimant. (Tr. at 72). Rather, Dr. Bird stated that his opinion was based on "patient responses and knowledge of his problems causing his inability to be gainfully employed." (*Id.*). Further, the ALJ cited that the last records from Bluestone Health Center in the file were dated May 2014, approximately nine months before Dr. Bird's opinion was rendered. (*Id.*). The ALJ found no indication in the opinion of what tests and objective evidence were considered by Dr. Bird, or what dates were covered in Dr. Bird's opinion.  (*Id.*). For those reasons, the ALJ gave Dr. Bird's opinion no weight. (*Id.*).

Claimant argues that Dr. Bird constituted a "prior treating source" because Claimant was treated at Bluestone Health Center for over three years and his "treatment records would have been available for Dr. Bird to consider, as well as his knowledge of the history of [Claimant]." (ECF No. 7 at 19). Further, Claimant states that Dr. Bird performed a clinical interview and physical examination of Claimant, which Claimant states disproves that the ALJ's finding that Dr. Bird's opinion was not supported by clinical evidence or records. (*Id.*).

However, the ALJ correctly concluded that Dr. Bird did not provide any physical examination findings or any indication of what objective records informed Dr. Bird's opinion. On February 2, 2015, Claimant presented to Dr. Bird "for disability papers to be filled out." (Tr. at 1284). Dr. Bird very clearly stated that because the disability forms did not require range of motion measurements and were instead a series of questions about Claimant's ability to perform certain work-related activities, Dr. Bird would proceed with completing the forms. (*Id.*). Dr. Bird expressly explained that he completed the forms based upon Claimant's "responses and knowledge of his problems causing his inability to

37

be gainfully employed." (*Id.*). Despite the fact that Dr. Bird's medical record described the encounter as an "extensive physical," the only physical examination findings that appear on the record of that visit were Claimant's vitals. (Tr. at 1285-86). Moreover, to the extent that Dr. Bird's opinion was based upon his review of Claimant's records, Dr. Bird provided no indication of what evidence supported his conclusions. (Tr. at 1236-39).

In this case, Claimant's classification as Dr. Bird's opinion as a "prior treating source" opinion is unavailing. Dr. Bird saw Claimant on one occasion for the sole purpose of completing disability paperwork. Dr. Bird explicitly stated that the opinions he expressed were based on Claimant's representations, not on Dr. Bird's own observations, examination, or treatment of Claimant. Although Claimant saw another provider, Ms. Cook, at Bluestone Medical Center for several years, there is no indication that Dr. Bird treated Claimant, or that he even worked at the medical practice when Claimant was a patient. As the ALJ remarked, Dr. Bird's opinion was completed many months after Claimant was last seen at Bluestone Medical Center. (Tr. at 72). Further, with the exception of the single time that Claimant spoke with Dr. Bird as noted above, Dr. Bird was not listed as Claimant's provider on his medical records. Rather, Ms. Cook was listed as the provider, and Ms. Cook electronically signed Claimant's records during his treatment at Bluestone Medical Center. (Tr. at 1084, 1096, 1109, 1114, 1122, 1131, 1136, 1141, 1145, 1152, 1158, 1166, 1169, 1181, 1185). Dr. Bird did not co-sign Claimant's treatment records and there is no other documentation indicating that he was Claimant's treating physician. (*Id.*). Given these circumstances, the ALJ appropriately concluded that Dr. Bird's opinion, based upon a one-time clinical interview of Claimant and without supporting evidence or explanation, was not entitled to any deference or weight.

Finally, Claimant argues that the ALJ erred in assigning great weight to the opinion

of Dr. Pella. On June 18, 2015, Dr. Pella completed a non-examining source statement based upon a review of Claimant's records. Dr. Pella opined that Claimant could perform a limited range of light work. (Tr. at 1245-49). The ALJ gave Dr. Pella's opinion great weight. (Tr. at 73). The ALJ explained that Dr. Pella's opinion was given more weight than Dr. Donatelli's opinion, which concluded that Claimant could not walk or stand, among other restrictions, because it was based upon most of the record and was supported by the medical evidence. (*Id.*).

Dr. Pella's opinion was indeed the most recent opinion regarding Claimant's physical functional abilities. Thus, Dr. Pella had the benefit of the most longitudinal evidence. Furthermore, the ALJ adequately addressed and provided substantial evidence for the weight assigned to Drs. Donatelli and Bird's opinions, which were the only conflicting opinions in the record. Finally, as previously discussed, the ALJ cited Claimant's stable gait, healing ulcer, and other factors which supported the ALJ's conclusion that Claimant was capable of performing a limited range of sedentary and light level work. (Tr. at 73-74).

Therefore, the undersigned **FINDS** that the weight that the ALJ assigned to the medical opinions offered in this case was supported by substantial evidence.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 7); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 13); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Faber, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  August 8, 2018

Cheryl A. Eifert
United States Magistrate Judge